TRESA M. BEDFORD,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY, agent of Michael
J. Astrue,

      Defendant.

**No. 09-CV-3081-DEO**

**MEMORANDUM OPINION AND ORDER**

_____

## I. INTRODUCTION AND BACKGROUND

Plaintiff, Tresa M. Bedford (hereinafter "Bedford"), seeks disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq., and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Tr. 77-79, 335-38. Bedford seeks review of the Commissioner's decision that she is not disabled under the Act. This Court has authority to review a final decision by the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Bedford alleges that she was disabled beginning on May 1, 2005, due to depression, anxiety, bipolar disorder, and post-traumatic stress disorder. She was born in 1971, is a mother

of three children, and has past relevant work experience as a nurse assistant, home attendant, and assembly room supervisor. Tr. 171. According to the ALJ, Bedford's earnings record shows that she remains insured through September 30, 2011. Tr. 26.

### A.  Medical Treatment Records

Bedford's mental health treatment records substantially begin on May 5, 2005, when she was referred to Psychiatry, Lee & Associates, with depression, suicidal ideation, and impulsive behavior. Tr. 189-193. Bedford reported problems involving her husband, who had moved out of their home to live with another woman. Tr. 189. She also reported losing her job for taking another person's credit card and reported she would be arrested for the crime. Tr. 189. She described that she felt as if she was floating above her body and watching herself do things, such as stealing the resident's credit card. Tr. 190. Bedford rated her depression and anxiety as a "10" on a 1-10 scale, 10 being the most depressed. Tr. 189. Bedford complained of constant fatigue and tiredness. Tr. 189, 192. She was diagnosed with major depression with psychotic features, marriage issues, family-of-origin issues,

education, and employment problems. Tr. 192. She was assessed a Global Access of Functioning ("GAF") score of 45. Tr. 192.

On July 6, 2005, Bedford saw Psychologist Dan Rogers for a consultative examination. Dr. Rogers noted Bedford's father was an alcoholic, was in prison for murder, and sexually abused Bedford. He also noted that Bedford's brother sexually abused her several times when she was 12. Tr. 181. Dr. Rogers noted Bedford's legal troubles and that Bedford had no social life and no real friends. Tr. 182.

Dr. Rogers observed that Bedford was "obviously depressed." Bedford's judgment was good about most things but "poor" regarding people. Tr. 182. Dr. Rogers concluded that Bedford had "major depression that has persisted for some time at a moderate level." He further concluded Bedford's pace was "very poor" and she was "not able to maintain concentration," and thus, she was "not able to carry out instructions reliably." Tr. 183. Dr. Rogers stated, "[Bedford] cannot interact appropriately with supervisors, coworkers, or the public for more than brief periods of time. It would be difficult for her to adjust to changes in the work place."

Tr. 183. He diagnosed Bedford with major depression, without psychosis, and depressive personality. He assessed Bedford a GAF score of 55. Tr. 183.

Bedford continued treatment at Psychiatry, Lee & Associates through December 2006. She began treatment at North-Central Iowa Mental Health Center in February 2007.

At Bedford's initial evaluation on February 13, 2007, she reported that she continued to have "quite a bit" of depression. Tr. 326. She reported that it took everything she had to get out of bed in the morning. She stated she lost interest in everything and had very low energy. Tr. 326. Bedford reported of her anxieties with respect to her husband, children, and financial condition. Tr. 326-27. She reported that she had very low self-esteem, which was very affected by what other people said or did. Tr. 327. Bedford also stated that she got off track easily and had a hard time focusing on the evaluation. Tr. 330. Michelle Shaver, Licensed Master Social Worker, diagnosed Bedford with major depressive disorder and assessed her a GAF score of 50. Tr. 331.

On March 28, 2007, Dr. Shaheena Minhas of North-Central Iowa Mental Health Center conducted a psychiatric evaluation.

Tr. 319-21.  At this evaluation, Bedford stated she believed she had depression all of her life because her father and brother sexually abused her from ages 10-13.  She complained of low energy, and she had poor concentration.  Tr. 319.  Dr. Minhas diagnosed Bedford in part with "major depressive disorder, severe, recurrent," and "moderately severe psychosocial stressors, financial issues, separated from husband."  Tr. 321.  Dr. Minhas assessed Bedford a GAF score of 50-55.  Tr. 321.

On May 16, 2007, Bedford saw Psychiatrist Paul Anderson for a Social Security Disability evaluation.  Tr. 306-09.  Dr. Anderson noted that he reviewed records from Lee and Associates and North-Central Iowa Mental Health Center as well as Dr. Rogers' evaluation.  He noted that he also had a functional capacity assessment and health records from Manson Family Health Clinic.  Tr. 306.  Dr. Anderson noted that the records and Bedford's own reported symptoms had "dramatically improved since 2005 on medication. . . .  Some of her improvement can also be related to the fact of therapy."  Tr. 307.  After discussing Bedford's medical, psychiatric,

educational and occupational history, Dr. Anderson concluded as follows:

> We have a lady here who's been sexually abused and molested. She presented at least on one occasion appearing psychotic and was treated for quite a long time for psychotic thinking. She was also involved in therapy and continues therapy now. She was diagnosed with [Attention Deficit Hyperactivity Disorder ("ADHD")] and continues with that treatment but on mental status examination still seems to be having quite a bit of difficulty concentrating.

Tr. 309. He diagnosed Bedford with the following conditions: major depression, recurrent; dysthymic disorder; ADHD; post traumatic stress disorder, chronic and delayed; probable borderline personality disorder; and "dealing with abuse issues that are exacerbated by her dependency needs that have been exacerbated by her abandonment by her husband." Tr. 309. Dr. Anderson assessed Bedford with a GAF score of 45. Tr. 309.

**B.   The ALJ Hearing**

**1.   Bedford's Testimony**

At the May 29, 2007, ALJ hearing, Bedford testified that she had gained 70 to 80 pounds in the prior two years, and she attributed the weight gain to her depression. She testified

she lived with her three children, who were 18, 17, and 11 years old. Tr. 356.

Bedford noted that she worked part time at Pizza Ranch. She testified that she worked two to two and a half hours a day, four or five days a week. She was paid $6.40 per hour. Tr. 357. Bedford testified that she could not work full-time because she got fatigued easily; she worked at a "very slow pace" and could not keep up with her co-workers. Tr. 357. Bedford also testified that she easily lost concentration and got off task. Tr. 357. When asked why she had these problems, Bedford referred to her depression and the feeling of not wanting to work and be a good member of society. She stated, "[i]f I could just stay holed up in my house on my couch all day, I would be perfectly happy. I just have lost interest in everything and I just don't want to do anything." Tr. 357.

Bedford testified about her prior job as a certified nursing assistant at Friendship Haven in Fort Dodge. Tr. 358. She testified that she worked there for three years, but lost her job on May 3, 2005, because she "took a resident's credit card and used it." Tr. 358. Bedford testified that she

attributed this behavior to her mental health issues at the time, stating, "I thought if I dressed better and looked better that it would bring my husband back." Tr. 359.

At her job at Pizza Ranch, Bedford testified that she generally worked from 10:00 a.m. to noon or 12:30 p.m. She was a dishwasher and had no significant interaction with the public. Tr. 363. Bedford testified that she thought she would have difficulty if she had to interact with the public in a workplace setting because she was "very flustered" and "uneasy being around a big group of people. . . ." Tr. 364. Bedford testified that, on a typical day when she got home from work, she sat on her couch. Tr. 364.

Bedford stated that she did not have friends to go see, and friends did not come to see her. She testified that she did not interact with people very well and it was "really hard" for her to make friends. Tr. 365. Bedford testified there was a time that she had a lot of friends, but she no longer had a desire to go anywhere or do anything. Tr. 365. She testified this started around the time that her husband left. Tr. 365.

Bedford testified that her kids took care of most of the cooking and cleaning in the house, although she would occasionally make supper. She dusted once in a while, but her kids did the vacuuming, sweeping, and laundry. Tr. 366.

Bedford further testified that she had problems with her memory and concentration. One example involved her driving, during which she would forget where she was. Tr. 368. Another example was when her kids would talk to her and she did not even hear them. Tr. 368. She testified that she was able to keep track of her appointments because she wrote them in a book.

### 2. Vocational Expert's Testimony

At the ALJ hearing, in response to a hypothetical similar to the ALJ's residual functional capacity finding in this case, the VE testified that the individual would not be able to perform past relevant work. Tr. 374. The VE testified that someone with the same age, education, and work experience as Bedford could perform work as a kitchen helper, day worker in domestic service (i.e. maid and housekeeping cleaners), and cleaner/housekeeping in lodging facilities. Tr. 374.

The ALJ provided the VE with a second hypothetical in which an individual had the same limitations as the first hypothetical, but the individual was unable to sustain an eight-hour workday. The ALJ testified that the hypothetical individual would not be able to perform any job on a full-time competitive basis. Tr. 375.

## C. The ALJ's Decision

The ALJ uses a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. A claimant must prove: (1) that he has not engaged in substantial gainful activity; (2) that he has a medically determinable severe impairment, as that term is defined in the regulations; and *either* (3) that his impairment meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is presumed to be disabled, and no further analysis is needed); *or* (4) that his impairment prevents him from performing his past relevant work. 20 C.F.R. § 404.1520. If the claimant carries his burden to this point, then the burden shifts to the Commissioner to prove there are other jobs the claimant can perform. Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006); Johnson v.

Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

In this case, the ALJ determined at step one that Bedford had not engaged in substantial gainful activity since May 1, 2005, Bedford's alleged onset date.  Tr. 26.

At step two, the ALJ determined that Bedford had the following severe combination of impairments:  major depressive disorder, recurrent, moderate; anxiety disorder, not otherwise specified, attention deficit hyperactivity disorder as well as borderline and depressive personality.  Tr. 26.

At step three, the ALJ found that Bedford did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 27.  The ALJ determined Bedford had moderate restriction of daily activities, moderate difficulties maintaining concentration, persistence and pace, moderate restriction of social functioning, and no periods of decompensation.  Tr. 27.

The ALJ assessed Bedford with the following residual functional capacity:

> to perform simple routine tasks which
> require occasional changes in the routine
> work setting, occasional independent
> decisions and occasional interaction with

the general public, co-workers and
supervisors.

Tr. 30. In arriving at this conclusion, the ALJ gave "some
weight" to the opinions of examining consultative
psychiatrists Dr. Rogers and Dr. Anderson "to the extent that
[Bedford] would likely experience variability with
concentration, persistence and pace, difficulty with social
interaction and adjusting to change in the workplace which
would not exceed a moderate level of limitation." Tr. 30.
The ALJ, however, gave "significant weight" to the opinions of
the State agency medical physicians and consultants, finding
the objective and subjective evidence supported their
opinions. Additionally, the ALJ noted that subsequent records
failed to show Bedford's condition deteriorated.

In evaluating the credibility of Bedford's statements
regarding her symptoms, the ALJ noted that the record revealed
Bedford's "psychosocial stressors, marital discord and parent-
child relationships were the primary sources impacting
symptoms." Tr. 31. The ALJ noted, however, that Bedford had
significant improvement with therapy and medications with
minimal side effects. Tr. 31. Additionally, the ALJ
determined that "[d]espite symptoms, [Bedford] was capable of

maintaining a household, working part-time and taking college level courses." Tr. 31. Finally, the ALJ determined that Bedford's testimony of excessive ongoing fatigue due to medication was not supported by the record, and the ALJ raised the "question of secondary gain in reference to statements made regarding public assistance." Tr. 31. Thus, the ALJ found Bedford's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Bedford's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 31.

After making his residual functional capacity finding, the ALJ determined at step four that Bedford was unable to perform her past relevant work as a nurse assistant, home attendant and assembly room supervisor. Tr. 32. At step five, the ALJ determined there were jobs that existed in significant numbers in the national economy that Bedford could perform as described by the VE during the course of the VE's testimony. These unskilled jobs included kitchen helper, domestic services day worker, and cleaner/housekeeping. Tr. 33. Thus, the ALJ determined Bedford was not disabled.

After the ALJ issued his decision on October 15, 2007, the Appeals Council denied Bedford's request for review on November 4, 2009.  Tr. 4-6.  Bedford subsequently filed the instant action.  This Court heard oral arguments and is now prepared to rule on the matter.

## II.  LAW AND ANALYSIS

In reviewing this case, this Court is required to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance of the evidence, but it is enough that a reasonable mind would find it adequate to support the ALJ's decision.  See Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  As long as there is substantial evidence in the record that supports the ALJ's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently.  See Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  If, after reviewing the record, it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Still, in reviewing the record this Court must remain mindful of the ALJ's "duty to develop the record fully and fairly" in the non-adversarial administrative proceeding. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

In this case, the ALJ's decision that Bedford is not disabled is not supported by substantial evidence on the record as a whole. Specifically, the ALJ's residual functional capacity findings as to Bedford's mental limitations are not supported by substantial evidence; thus, the ALJ's conclusion at step five that jobs existed in the national economy that Bedford could perform is incorrect.

The ALJ concluded Bedford had the residual functional capacity "to perform simple routine tasks which require occasional changes in the routine work setting, occasional independent decisions and occasional interaction with the general public, co-workers and supervisors." Tr. 30. As mentioned, the ALJ gave "significant" weight to the opinions

of the State agency medical physicians and consultants, and only "some" weight to the opinions of Dr. Rogers and Dr. Anderson, who personally examined Bedford. Even in affording "some" weight to their opinions, the ALJ's residual functional capacity findings are not supported by substantial evidence.

Dr. Rogers concluded Bedford had "very poor" pace and was unable to maintain concentration. Tr. 183. He concluded Bedford was "not able to carry out instructions reliably." Tr. 183. Dr. Rogers further concluded Bedford could not "interact appropriately with supervisors, coworkers, or the public for more than brief periods of time" and that it would be difficult for her to adjust to workplace changes. Tr. 183. This finding, of course, is not consistent with the ALJ's residual functional capacity finding that Bedford could make "occasional" changes and occasionally interact with the public, co-workers, and supervisors.

Additionally, Dr. Anderson, who examined Bedford just prior to the ALJ hearing, recognized Bedford had improved some, but nevertheless assessed her with a GAF score of 45. He attributed her problems primarily to her past sexual abuse, also noting she had ADHD, post traumatic stress disorder, and

major depression.   He recognized Bedford's symptoms were exacerbated by dependency issues and the abandonment by her husband.   Tr. 309.

There is no indication that either Dr. Anderson or Dr. Rogers opined Bedford could work full-time, especially given Dr. Anderson's grim assessment of her condition and her GAF score of 45.   Both Dr. Rogers' and Dr. Anderson's opinions are supported in Bedford's extensive treatment record.   Dr. Anderson, who examined Bedford in May 2007, had all of Bedford's treatment records with respect to her mental condition; thus, his opinion was fully informed and supported in the record.

This Court reviewed the record and was unable to find a treating or examining source who suggested Bedford was capable of returning to full-time work.   In her brief, Bedford cites to her history of GAF scores to illustrate the ongoing nature of her impairments.   While her GAF scores ranged from 45-55, they often returned to 50.   <u>See</u> Pl. Br. 6.   The Court is persuaded Bedford's GAF scores simply illustrate her lack of overall improvement for years after she stopped working, and further support her argument that she was unable to return to

full-time work.  See Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009) ("The history of GAF scores at 50 or below, taken as a whole, indicate [the claimant] has 'serious symptoms ... or any serious impairment in social, occupational or school functioning....'") (citing Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) ("noting a GAF score of 50 reflects a serious limitation on a claimant's ability to perform basic life tasks; VE testified that an individual with a GAF score of 50 could not work.")).

With this in mind, the government argues that Bedford's work, school, and family activities are inconsistent with her allegation that she is disabled.  Specifically, Bedford worked part-time at Pizza Ranch, received her GED, attended college courses, and had three children for whom she was responsible raising.  A closer review of the record, however, reveals that Bedford had great difficulty raising, controlling, and getting along with her children.  Additionally, while Bedford was often excited about taking college courses, there is nothing to suggest this venture was successful in any meaningful way, as there is no evidence of her attendance record or grades. Finally, Bedford's part-time work at Pizza Ranch involved

washing dishes two to two and a half hours per day, and nearly no interaction with the public. This work experience is nominal and is no indication Bedford was capable of performing work for eight hours a day, five days a week.

The government further argues that Bedford's depression was merely situational with respect to her criminal charges and problems with her husband, family, and finances. The record, however, reveals that she was depressed about nearly all situations in her life. Bedford clearly had a breakdown in May 2005, as it appeared her life was falling apart, and there is no indication she ever recovered or improved to the point that she was able to return to full-time work. Bedford's GAF scores, treatment notes, and Dr. Rogers' and Dr. Anderson's evaluations as a whole support this conclusion.

Moreover, any argument that her depression recently started as a result of one situation or another is not supported in the record. Bedford's medical records and treatment notes reveal that she often referred to her childhood for the reasons her depression started. She was sexually abused by both her father and brother at a young age. Her father is also serving a life sentence for murder. Dr.

Anderson even refers to her past abuse in his summary findings. Thus, while Bedford's struggles with her criminal charges, her husband, and her finances clearly sent her over the edge in May 2005, her depression started long ago and eventually manifested itself to the point that Bedford was unable to work. She may, one day, be capable of returning to the competitive work force, but the record does not indicate that will happen soon.

The government similarly points out that Bedford's full-time employment ended not because of her depression, but rather because she stole a resident's credit card while working as a nurse assistant. The Court acknowledges this and also concludes Bedford is no saint. However, she was clearly not of sound mind when she committed this offense. She testified that she stole the credit card because she wanted to buy nicer clothes to entice her husband to return to her. Something was clearly wrong with her mental state to have that kind of logic and judgment, and she acknowledged this, even stating her depression may have contributed to the theft.

Because the Court is persuaded the record overwhelmingly supports a finding that Bedford was unable to perform full-time work, the ALJ erred by concluding at step five that jobs existed in the national economy that Bedford could perform. Under Social Security Ruling (SSR) 96-8p, a person's residual functional capacity must be evaluated based on work performed on a regular and continuing basis, which means eight hours a day for five days a week or an equivalent work schedule. The Commissioner's position is that, "at step five of the disability determination, 'only an ability [on the part of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled.'" Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000). Additionally, as mentioned, the VE testified that an individual who was unable to sustain an eight-hour work day would be unable to perform any job on a full-time competitive basis. Tr. 375.

Even assuming the average employer in the national economy would hire Bedford, the Court is persuaded she would suffer the same disabling limitations and would not be able to keep a job for any significant period of time. To determine at step five whether a claimant can perform other jobs in the

national economy, the Secretary must consider whether the claimant can actually find and hold a job in the real world. Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir. 1984). No reasonable employer in the national economy would tolerate Bedford for any significant period of time. This is no doubt due to her disabling depression. The record as a whole does not support any conclusion that Bedford is employable in the national economy. The record as a whole overwhelmingly supports a finding of disability.

## III.     CONCLUSION

For the reasons stated herein, the Court is persuaded that substantial evidence on the record does not support the ALJ's finding that Bedford is not disabled. Substantial evidence reveals that there are no jobs in the national economy she could perform given her mental impairments. The Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record contains sufficient evidence to allow the Court to render this decision.

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is

**reversed**, and the Commissioner is directed to compute and award disability benefits to Bedford with an onset date of May 16, 2007.

A timely application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Bedford's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 19th day of April, 2011.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa